UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TAMEKIA OLIVE,<br><br>　　　　*Plaintiff*,<br><br>　　v.<br><br>MICHAEL TUBBS, in his official capacity as SHERIFF OF MOREHOUSE PARISH, LOUISIANA, and ALVIN HOLMES, in his individual capacity,<br><br>　　　　*Defendants*. | Civil Action No. 3:22-cv-5205<br><br>*Jury Trial Demanded* |

## COMPLAINT

Tamekia Olive, by and through the undersigned counsel, brings claims against Sheriff Michael Tubbs, in his official capacity as Sheriff of Morehouse Parish, and Alvin Holmes, in his individual capacity, for violating her rights under federal and state law when they wrongfully arrested her without probable cause on September 10, 2021. Ms. Olive hereby states and alleges as follows:

## NATURE OF THE ACTION

1. This is a case about Defendants' abuse of their law enforcement powers to wrongfully arrest a citizen who was exercising her rights to file a complaint about police misconduct and publicly record her interaction with law enforcement officers.

2. On September 10, 2021, Ms. Olive walked into the public lobby of the Morehouse Parish Sheriff's Office ("MPSO") in order to file a complaint against an officer of the MPSO, Corporal Cobi Brown. Ms. Olive intended to file a complaint against Corporal Brown for verbally threatening her the previous night.

3. Ms. Olive spoke with Chief Deputy James Mardis of the MPSO, who refused to allow her to file a complaint without providing her name. Chief Deputy Mardis then ordered Ms. Olive to leave the MPSO lobby building, threatening her with arrest if she refused to leave. Ms. Olive exercised her First Amendment right to record this interaction with Chief Deputy Mardis on her cell phone.

4. A few minutes later, while she was standing on the public sidewalk outside the lobby of the MPSO, Ms. Olive was approached by Investigator Alvin Holmes. Ms. Olive also filmed this interaction with Investigator Holmes. Investigator Holmes insisted that Ms. Olive was required to identify herself, regardless of whether he had probable cause or reasonable suspicion that Ms. Olive had committed a crime.

5. After Ms. Olive declined to provide her name to Investigator Holmes, Investigator Holmes arrested her for the charge of "resisting an officer by refusing to identify." While in the process of handcuffing her, Investigator Holmes took Ms. Olive's phone from her hand and turned off the video recording, thus preventing her from continuing to exercise her right to publicly record the police.

6. The Louisiana statute under which Ms. Olive was arrested, La. Rev. Stat. Ann. 14:108, only requires an individual to identify herself to a law enforcement officer if the officer is already in the process of executing a lawful arrest or detention for a separate crime. Investigator Holmes had not arrested or detained Ms. Olive for any other crime, as there was no probable cause or reasonable suspicion to justify such an arrest or detention.

7. Investigator Holmes's actions, and his stated belief that he was justified in arresting Ms. Olive for refusing to identify regardless of whether he suspected her of committing a crime, demonstrate that he was acting in accordance with an established MPSO custom of

arresting anyone who refuses to identify. Investigator Holmes's adherence to this custom directly resulted in the unlawful deprivation of Ms. Olive's rights.

8. Following her arrest, several other MPSO officers told Ms. Olive she was required to identify herself to a law enforcement officer, regardless of whether the officer suspected her of committing a crime. These statements provide further evidence that the MPSO had a custom of unlawfully arresting individuals who refused to identify without reasonable suspicion or probable cause that those individuals had committed a crime.

9. Investigator Holmes's actions also reflect a clear failure on the part of the MPSO to supervise and train its officers. The arrest of Ms. Olive, in blatant violation of federal and state law, illustrates that Investigator Holmes was insufficiently supervised and trained for his duties as an officer of the MPSO. Ms. Olive's arrest was the highly predictable consequence of the MPSO's failures, such that Sheriff Tubbs, as the final policymaker responsible for law enforcement in Morehouse Parish, is responsible for the violations of Ms. Olive's rights.

10. In wrongfully arresting Ms. Olive without probable cause and while she was exercising her First Amendment rights, Sheriff Tubbs and Investigator Holmes acted under the color of law in violation of Ms. Olive's constitutional rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution and in violation of Louisiana's common-law prohibition against false arrest.

## JURISDICTION AND VENUE

11. This action is brought pursuant to 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution, and the laws of the State of Louisiana. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

12. This Court, under 28 U.S.C. § 1367, has supplemental jurisdiction over claims asserted under the laws of the State of Louisiana because they arise out of the same operative facts and are so related to the federal claims that they are part of the same case or controversy.

13. Venue is proper in this district in accordance with 28 U.S.C. § 1391(b) because Plaintiff resides in this district, Morehouse Parish is located in this district, all Defendants, upon information and belief, reside in this district, and a substantial part of the events giving rise to the claims herein arose in this district.

## PARTIES

14. Plaintiff Tamekia Olive is a resident of Bastrop, Louisiana, which is located in Morehouse Parish and the Western District of Louisiana.

15. Defendant Alvin Holmes, upon information and belief, is a resident of Morehouse Parish, which is located in the Western District of Louisiana. Upon information and belief, at all times pertinent and relevant to this action, Defendant Holmes was employed by the MPSO and was acting in the course and scope of his employment and under the color of law. Defendant Holmes is sued in his individual capacity.

16. Defendant Michael Tubbs, in his official capacity as Sheriff of Morehouse Parish, was responsible for the hiring, training, supervision, discipline, administration, policies, customs, practices, operations, management, and control of the MPSO and its officers, including Defendant Holmes. As such, as a matter of federal law, Defendant Tubbs was the final policymaker for the MPSO in the areas of law enforcement and the employment, training, and supervision of MPSO deputies, and thus is liable in his official capacity for unlawful MPSO policies and customs. As a matter of Louisiana law, Defendant Tubbs is liable in his official capacity for his actions as final policymaker and is vicariously liable for the actions of Defendant Holmes.

## FACTS

### Ms. Olive Is Threatened by Corporal Brown

17. On the night of September 9, 2021, Ms. Olive was sitting in her car inside the carport next to her house in Bastrop, Louisiana. While she was sitting in the car, she noticed a glimmer of light in the rearview mirror. After getting out of her car to investigate, she found an MPSO vehicle parked outside of her house, without its lights on, and an officer walking around the outside of her house with a flashlight.

18. Ms. Olive got out of her car to speak to the officer, who identified himself as Corporal Cobi Brown of the MPSO. Corporal Brown told her that someone had called 911 from this address, but had hung up before saying anything. Ms. Olive suspected that it was one of her children who made the false 911 call. She confirmed this after going inside to confront her children, and she brought her son outside to apologize to Corporal Brown.

19. Corporal Brown asked multiple times for Ms. Olive's name. Ms. Olive declined to provide her name, stating that she was not required by law to provide her name. Corporal Brown then turned to leave and said, "I'll be seeing you later." Ms. Olive interpreted this as a threat.

### Ms. Olive Is Prevented from Filing a Complaint by Chief Deputy Mardis

20. The next morning, on Friday, September 10, 2021, Ms. Olive went to the MPSO to file a complaint against Corporal Brown for threatening her.

21. After walking into the public lobby of the MPSO, Ms. Olive spoke to Chief Deputy James Mardis. She told Chief Deputy Mardis about her encounter with Corporal Brown the night before, and explained that she wished to file a complaint about Corporal Brown.

22. Chief Deputy Mardis told her that he did not think that Corporal Brown had done anything wrong, and that Ms. Olive would need to provide her name to file a complaint. Ms.

Olive asked why she could not provide an anonymous complaint, but Chief Deputy Mardis insisted that she must provide her name.

23. After several minutes of discussion about this issue, Chief Deputy Mardis ordered Ms. Olive to leave. Ms. Olive stated that she was entitled to be in the lobby because it was a public building. Chief Deputy Mardis threatened her with arrest if she did not leave. Ms. Olive subsequently relented and left the lobby without filing a complaint.

24. Ms. Olive filmed this entire interaction with Chief Deputy Mardis on her smartphone, in an exercise of her First Amendment right to film the police in public spaces.

**Ms. Olive is Wrongfully Arrested by Defendant Holmes**

25. A few minutes after Ms. Olive left the MPSO lobby, as she was standing on the public sidewalk outside the MPSO lobby, Defendant Holmes emerged from the building and approached her.

26. In his official incident report following Ms. Olive's arrest, Chief Deputy Mardis stated that he sent Defendant Holmes outside to talk to Ms. Olive "to see if he could resolve her issues."

27. Ms. Olive explained to Defendant Holmes that she wanted to file a complaint against Corporal Brown, and that Chief Deputy Mardis was refusing to allow her to file a complaint if she did not provide her name.

28. Defendant Holmes asserted that Ms. Olive was required to identify herself to law enforcement when asked under La. Rev. Stat. Ann. 14:108. Ms. Olive explained that she was within her rights to refuse to provide her name to Defendant Holmes because he did not have reasonable suspicion or probable cause that she was committing a crime.

29. Despite Ms. Olive's legally accurate explanation of her rights, Defendant Holmes continued to insist that Ms. Olive was required to identify herself to law enforcement. After Ms. Olive continued to decline to identify herself, Defendant Holmes arrested her for "resisting by refusing to identify."

30. Defendant Holmes at no point told Ms. Olive that she was suspected of committing any other crime. Additionally, neither he nor the MPSO has since accused Ms. Olive of committing another crime on September 10, 2021.

31. At the moment that Ms. Olive was arrested, she was continuing to exercise her First Amendment right to record the police. The arrest prevented her from continuing to exercise that First Amendment right, because Defendant Holmes took her phone away from her and turned off the recording as he applied handcuffs to her.

32. Ms. Olive was charged with resisting an officer by refusing to identify under La. Rev. Stat. Ann. 14:108(B)(1)(c). Ms. Olive was taken into the MPSO building and then to the Morehouse Parish Jail, where she was booked for this offense.

33. While she was inside the MPSO building before being booked in the Morehouse Parish Jail, Ms. Olive was told by several other officers that she is required to identify herself when asked by a law enforcement officer, regardless of whether the officer has reasonable suspicion or probable cause that she committed another crime, because Louisiana is a "stop and identify state."

34. She was released later that same day with a summons to reappear in Court on October 21, 2021.

**Ms. Olive Personally Notifies Defendant Tubbs of Her Wrongful Arrest**

35. On the following Monday, September 13, 2021, Ms. Olive called the MPSO to speak to Defendant Tubbs. Defendant Tubbs did not initially answer Ms. Olive's call, but returned her call several minutes later.

36. During that call, Ms. Olive explained the events of September 10, 2021 to Defendant Tubbs. Defendant Tubbs told Ms. Olive that she could seek recourse in federal and state Court.

**Defendant Tubbs's Responsibility, as Final Policymaker of the MPSO, for Ms. Olive's Wrongful Arrest**

37. During all times relevant to this action, Defendant Tubbs possessed final policymaking authority over the screening, training, supervision and discipline of police officers employed by the MPSO, including Defendant Holmes. Defendant Tubbs, as final policymaker, is ultimately responsible for the policies and customs of the MPSO.

38. The MPSO has an established custom of arresting individuals who refuse to identify themselves to law enforcement, regardless of whether the arresting officer has reasonable suspicion or probable cause that the individual committed an independent crime. This custom is illustrated by the actions and statements of Defendant Holmes, as well as the statements of his fellow officers to Ms. Olive following her arrest.

39. Defendant Holmes was never disciplined for arresting Ms. Olive without probable cause. Plaintiff's counsel requested public records from the MPSO regarding the disciplinary records of Defendant Holmes. The MPSO informed Plaintiff's counsel that no disciplinary records exist.

40. Defendant Tubbs's failure to discipline Defendant Holmes provides further evidence that Defendant Holmes's actions were in line with MPSO custom. Defendant Tubbs's

failure to take action, despite his conversation with Ms. Olive on September 13, 2021, confirms that the wrongful custom was sanctioned by the final policymaker responsible for law enforcement in Morehouse Parish.

41.   This custom of arresting individuals for refusing to identify, absent reasonable suspicion or probable cause that the individuals committed an independent crime, was the direct and proximate cause of Ms. Olive's arrest.

42.   Defendant Tubbs failed to adequately supervise Defendant Holmes in the exercise of his authority to effectuate arrests. This is illustrated by the inadequate training that Defendant Holmes received on the constitutional requirements for executing a lawful arrest and the circumstances in which an officer is permitted to demand a citizen's identification—training that was critical to the tasks that Defendant Holmes performed as part of his employment.

43.   Plaintiff's counsel requested public records from the MPSO regarding Defendant Holmes's training in constitutional and civil rights. The MPSO produced only one training certificate from the North Delta Training Academy and was unable to produce documentation as to the content of Defendant Holmes' training in constitutional and civil rights.

44.   Defendant Tubbs's failure to properly supervise MPSO officers is further illustrated by his and his subordinates' failure to supervise Defendant Holmes's interaction with Ms. Olive, despite the obvious likelihood that the interaction might lead to conflict and thus called for supervision.

45.   Defendant Tubbs's call with Ms. Olive on September 13, 2021 also suggests that he was aware of the wrongful custom and could have prevented officers from executing wrongful arrests had he elected to adequately supervise MPSO officers.

46. Defendant Tubbs's failure to adequately supervise and train MPSO officers shows a deliberate indifference to the rights secured by the First, Fourth, and Fourteenth Amendments of the U.S. Constitution to the citizens of Morehouse Parish and Ms. Olive in particular.

47. Ms. Olive's arrest at the hands of Defendant Holmes was the inevitable consequence of Defendant Tubbs's failure to properly supervise and train Defendant Holmes.

**The Physical and Psychological Impact on Ms. Olive**

48. As a direct and proximate result of the Defendants' conduct, Ms. Olive suffered significant psychological and physical harms.

49. Ms. Olive experienced constant anxiety and sleeplessness for several weeks following the arrest, sleeping only 2–3 hours a night. Due to this anxiety, Ms. Olive also had difficulty eating solid food for a week after the arrest.

50. These psychological damages also impacted Ms. Olive's ability to provide care for her two young children, for whom she is the primary caregiver.

51. Ms. Olive experienced bruising on and tingling in her right arm – in which she has a metal plate – where Defendant Holmes placed the handcuffs on her during the arrest.

### CAUSES OF ACTION

#### COUNT 1:
#### UNLAWFUL ARREST IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 (AGAINST DEFENDANT HOLMES)

52. Plaintiffs hereby incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

53. 42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

-10-

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

54. The Fourth Amendment of the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," as applied to the states under the Fourteenth Amendment of the U.S. Constitution.

55. At all relevant times, Defendant Holmes was a state actor acting under the color of law and pursuant to MPSO policies, customs, and practices.

56. It was clearly established at the time of Ms. Olive's arrest that the Fourth and Fourteenth Amendments prohibit state actors from arresting individuals without probable cause. *See, e.g.*, *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1305 (5th Cir. 1995).

57. It was clearly established at the time of Ms. Olive's arrest that the Fourth and Fourteenth Amendments prohibit state actors from detaining individuals without "specific and articulable facts," or reasonable suspicion, that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968).

58. Under La. Rev. Stat. Ann. 14:108, an "arrested or detained party" is required to provide identification to an officer during the course of a lawful detention or arrest. A lawful detention or arrest is thus a predicate for this offense, and a Louisiana law enforcement officer may only detain a person in public "whom he reasonably suspects is committing, has committed, or is about to commit an offense." La. Code Crim. Proc. Ann. art. 215.1. If a law enforcement officer has "no legal basis to stop" someone, that individual is "not required to give them the identifying information requested" and is "legally justified in refusing to identify himself." *Trahan v. City of Scott*, No. 00-1246, p. 3–4 (La. App. 3 Cir. 3/14/01), 802 So. 2d 24, 27.

59. When Defendant Holmes arrested Ms. Olive under La. Rev. Stat. Ann. 14:108, he was not in the process of effectuating a lawful detention or arrest for a different offense.

Indeed, Defendant Holmes lacked reasonable suspicion or probable cause that Ms. Olive was committing a separate offense before he demanded her identification.

60. Because Defendant Holmes did not have reasonable suspicion or probable cause that Ms. Olive was committing a crime, Ms. Olive was not required to identify herself under Louisiana law. Defendant Holmes thus lacked probable cause to arrest her under La. Rev. Stat. Ann. 14:108 when she declined to identify herself.

61. In arresting Ms. Olive without probable cause and under the color of state law, Defendant Holmes deprived Ms. Olive of her constitutional rights under the Fourth and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

62. Any reasonable officer would have known that arresting Ms. Olive under these circumstances would violate her clearly established constitutional rights. Indeed, the U.S. Supreme Court and the U.S. Court of Appeals for the Fifth Circuit have repeatedly held that an individual cannot be arrested solely for refusing to provide identification, absent at least reasonable suspicion that the individual is committing a crime. *See Brown v. Texas*, 443 U.S. 47, 53 (1979); *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 188 (2004); *Turner v. Lieutenant Driver*, 848 F.3d 678, 695 (5th Cir. 2017).

63. As a direct and proximate result of this false arrest, Ms. Olive suffered actual physical, mental, and emotional harm.

64. Ms. Olive is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

**COUNT 2:
VIOLATION OF THE RIGHT TO RECORD LAW ENFORCEMENT UNDER THE**

## FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 (AGAINST DEFENDANT HOLMES)

65. Plaintiffs hereby incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

66. The First Amendment of the U.S. Constitution prohibits "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances," as applied to the states under the Fourteenth Amendment to the U.S. Constitution.

67. It was clearly established at the time of Ms. Olive's arrest that publicly recording the actions of the police is a form of constitutionally protected speech under the First Amendment.

68. Ms. Olive was engaging in constitutionally protected speech when she recorded her conversations with Chief Deputy Mardis and Defendant Holmes, which took place on public property, on her cellphone.

69. Ms. Olive was forced to stop recording when she was wrongfully arrested, and thus was prevented from continuing to exercise her First Amendment right to record the police.

70. In wrongfully arresting Ms. Olive under the color of state law and thereby preventing her from publicly recording the police, Defendant Holmes deprived Ms. Olive of her constitutional rights under the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1983.

71. Any reasonable law enforcement officer would have known that this conduct violated Ms. Olive's clearly established constitutional rights. The U.S. Court of Appeals for the Fifth Circuit has repeatedly held that individuals have a First Amendment right to record the

police in public. *See Turner*, 848 F.3d at 688; *Kokesh v. Curlee*, 14 F.4th 382, 393 (5th Cir. 2021).

72. As a direct and proximate result of this violation of her rights, Ms. Olive suffered actual physical, mental, and emotional harm.

73. Ms. Olive is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

### COUNT 3:
### *MONELL* CLAIM FOR VIOLATIONS OF THE FIRST, FOURTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 (AGAINST DEFENDANT TUBBS)

74. Plaintiffs hereby incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

75. A municipality or other local governmental body is liable under 42 U.S.C. § 1983 if the governmental body itself subjects a person to a deprivation of rights, or "causes" a person to be subjected to such deprivation. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 692 (1978).

76. A municipality causes a deprivation of rights when its official policy is the "moving force" of the constitutional violation. *Id.* at 694.

77. An official municipal policy can be demonstrated by "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984).

78. A municipality can be held liable for an unlawful custom when "officials to whom that body has delegated policy-making authority" have "actual or constructive knowledge" of the custom. *Id.* at 841.

79. The failure to supervise or train officers who violate a plaintiff's rights can amount to an official policy where a final policymaker has "sufficient notice" that the failure to supervise or train is likely to lead to constitutional violations. *Brown v. Bryan Cnty.*, 219 F.3d 450, 460 (5th Cir. 2000).

80. An arrest is the type of situation in which citizens are at risk of losing their constitutional rights, given the deprivation of liberty that an arrest causes. Thus, in order to ensure that officers are properly supervised in conducting arrests, it is essential to train officers on both the criminal laws that might provide a basis for arrest, and on the constitutional limitations for effectuating an arrest.

81. Defendant Holmes's arrest of Ms. Olive for refusing to identify herself, and his stated belief that he was not required to have reasonable suspicion or probable cause that she was committing another crime when he demanded her to identify, illustrate that the MPSO had a custom of unlawfully arresting those who decline to identify without an independent legal basis for detention or arrest.

82. The statements of Defendant Holmes's fellow officers to Ms. Olive after she was arrested provide further evidence that Defendant Holmes was following an established custom. *See Montano v. Orange Cnty., Texas*, 842 F.3d 865, 875 (5th Cir. 2016) (holding that "the consistent testimony of jail employees is sufficient to prove an established de facto policy.").

83. Defendant Tubbs's failure to discipline Defendant Holmes, even after he was personally put on notice of the violation by Ms. Olive, further demonstrates that Defendant Tubbs, as final policymaker for the MPSO, was aware of and acquiesced to this unlawful custom, such that he is liable for that custom in his official capacity. *See Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 793 (5th Cir. 2020) ("When the official policymaker knows about

misconduct yet allegedly fails to take remedial action, this inaction arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy.'").

84. The MPSO's unlawful custom of arresting those who refuse to identify, regardless of the existence of an independent basis for detention or arrest, was the direct and proximate cause of Ms. Olive's unlawful arrest and the deprivation of her First, Fourth, and Fourteenth Amendment rights.

85. In addition, Ms. Olive's arrest was the predictable consequence of Defendant Tubbs's failure to supervise Defendant Holmes in conducting arrests and to train Defendant Holmes on the scope of Louisiana criminal law and constitutional rights. Defendant Holmes's actions illustrate such a misunderstanding of those essential laws that it provides evidence of Defendant Tubbs's deliberate indifference in training him on those laws and supervising him in executing his authority under those laws.

86. The MPSO's failure to produce any documentation of the training that it provides in constitutional rights and Louisiana criminal law illustrates that the failure to train Defendant Holmes is just one instance of a widespread practice of inadequate supervision and training.

87. Given the likelihood that Defendant Holmes's encounter with Ms. Olive could lead to an arrest, Defendant Tubbs and his subordinates' failure to provide proper supervision of Defendant Holmes's interaction with Ms. Olive illustrates deliberate indifference toward Ms. Olive's constitutional rights.

88. As a direct and proximate result of the MPSO's custom of unlawfully arresting individuals for refusing to identify, as well as of the failure to supervise and train Defendant Holmes and other MPSO officers, Ms. Olive suffered actual physical, mental, and emotional harm.

89.     Ms. Olive is entitled to attorneys' fees and costs under 42 U.S.C. § 1988, prejudgment interest, and costs allowable by federal law.

## COUNT 4:
## FALSE ARREST UNDER LOUISIANA LAW (AGAINST DEFENDANT HOLMES)

90.     Plaintiffs hereby incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

91.     Under Louisiana law, the tort of false arrest consists of the following two elements: (1) detention of the person; and (2) the unlawfulness of the detention. *Wilson v. City of Shreveport*, 40,383, p. 4 (La. App. 2 Cir. 2/10/06), 921 So. 2d 254, 257, writ denied, 2006-0509 (La. 5/5/06), 927 So. 2d 321. The arresting officer must have probable cause, or "reasonable cause to believe" that the person to be arrested has committed an offense at the time of the arrest for the detention to be considered lawful. *See id.*; La. Code Crim. Proc. Ann. art. 213.

92.     An individual's refusal to furnish identification on demand, without reasonable belief that the individual has committed a separate crime, does not provide a basis for an arrest under La. Rev. Stat. Ann. 14:108(B)(1)(c). *See White v. Morris*, 345 So. 2d 461, 465 (La. 1977); *Ross v. Sheriff of Lafourche Par.*, 479 So. 2d 506, 510 (La. Ct. App. 1985).

93.     Defendant Holmes lacked a reasonable belief that Ms. Olive had committed a separate crime when he arrested her under La. Rev. Stat. Ann. 14:108. Ms. Olive was only charged with resisting an officer by refusing to identify under La. Rev. Stat. Ann. 14:108; there was not probable cause that she had committed any other offense. Defendant Holmes thus lacked probable cause to arrest Ms. Olive.

94.     Ms. Olive suffered an unlawful detention amounting to a false arrest under Louisiana law.

95. As a direct and proximate result of her false arrest, Ms. Olive suffered actual physical, mental, and emotional harm.

96. Ms. Olive is entitled to attorneys' fees and costs, prejudgment interest, and any other relief allowable by federal law.

### COUNT 5:
### VICARIOUS LIABILITY FOR FALSE ARREST UNDER LOUISIANA LAW (AGAINST DEFENDANT TUBBS)

97. Plaintiffs hereby incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

98. Under Louisiana law, an employer will be liable for the tortious conduct of its employee where the employee is acting within the course and scope of his employment. *Parker v. Town of Woodworth*, 2014–943, p. 25 (La. App. 3 Cir. 3/4/15), 160 So. 3d 1113, 1129, writ denied, 2015-0659 (La. 5/22/15), 171 So. 3d 254. Generally, an employee's conduct is within the course and scope of his employment "if the conduct is of the character and nature that he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer." *Id.* (quoting *Brasseaux v. Town of Mamou*, 1999–1584, p. 7 (La. 1/19/00), 752 So. 2d 815, 820).

99. Defendant Holmes was acting within the course and scope of his employment when he arrested Ms. Olive unlawfully. Defendant Holmes was sent outside to speak with Ms. Olive by a supervisor, Chief Deputy Mardis; the arrest occurred just outside of the MPSO lobby; and Defendant Holmes's conduct, executing an arrest, was of the character and nature that he is employed as an officer to perform.

100. Therefore, Defendant Tubbs, as the final policymaker responsible for law enforcement in Morehouse Parish, is vicariously liable for Defendant Holmes's tortious false arrest and false imprisonment of Ms. Olive.

## PRAYER FOR RELIEF

101. In light of the foregoing, Plaintiff respectfully requests that this Court enter judgment against each Defendant, jointly and severally, and award the following relief in an amount to be determined at trial for violation of Ms. Olive's constitutional, civil, and common law rights:

   a. Compensatory damages to be developed during discovery and proven at trial;

   b. A declaration that Defendant Alvin Holmes and Defendant Mike Tubbs violated Ms. Olive's constitutional, civil, and common law rights to free speech and to be free from wrongful arrest;

   c. Reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988; and

   d. Such other relief as this Court may deem just and proper.

Dated: September 7, 2022

                        Respectfully submitted,

                        */s/ Bridget Wheeler*

E. Bridget Wheeler (Louisiana Bar No. 37546)
ACLU FOUNDATION OF LOUISIANA
1340 Poydras Street, Ste. 2160
New Orleans, LA 70112
Tel: 504 522 0628
bwheeler@laaclu.org

Nora Ahmed* (New York Bar No. 5092374)
ACLU FOUNDATION OF LOUISIANA
1340 Poydras Street, Ste. 2160
New Orleans, LA 70112
Tel: 504 522 0628
nahmed@laaclu.org

Michael Scheininger* (D.C. Bar No. 173393)
Sarah Parker*+ (New York Bar No. 5960125)
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5804
mscheininger@cov.com
sparker@cov.com

Sara Dennis* (New York Bar No. 5799812)
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
Tel: (212) 841-1272
sdennis@cov.com

*Counsel for Plaintiff*

*Pro Hac Vice Forthcoming
+Member of the Bar of New York; District of Columbia Bar membership pending; supervised by principals of the Firm.*